## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| NATIONAL FISH AND SEAFOOD, INC., | ) | Chapter 7 |
| Debtor | ) | Case No. 19-11824-CJP |
| | ) | |
| | ) | |
| JOHN O. DESMOND, CHAPTER 7 | ) | |
| TRUSTEE, | ) | |
| | ) | |
| Plaintiff | ) | AP No. 21-01068-CJP |
| | ) | |
| v. | ) | |
| | ) | |
| NORTHERN OCEAN LIQUIDATING | ) | |
| CORPORATION FKA NORTHERN | ) | |
| OCEAN MARINE, INC., | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| | ) | |

## <u>MEMORANDUM OF DECISION</u>

The plaintiff John O. Desmond (the "Trustee"), chapter 7 Trustee of the bankruptcy

estate of National Fish and Seafood, Inc. (the "Debtor"), seeks summary judgment in his favor

[Dkt. No. 51] (the "Trustee's Motion") with respect to this adversary proceeding to recover

transfers made by the Debtor to the defendant Northern Ocean Liquidating Corporation f/k/a

Northern Ocean Marine, Inc. ("Defendant" or "NOLC") during the ninety-day period before the

filing of Debtor's bankruptcy case as preferential payments pursuant to 11 U.S.C. §§ 547(b) and

550.[1]  NOLC opposes the Trustee's Motion and has filed a cross-motion for summary judgment

[Dkt. No. 57] (the "Defendant's Cross-Motion," together with the Motion, the "Motions"),

---

[1] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "Bankruptcy Code" or "Code").

requesting a determination that the transfers are not avoidable as they were made in the ordinary course of business pursuant to § 547(c)(2)(A).

For the reasons discussed below, I will grant in part and deny in part each of the Motions. The parties have agreed that § 547(c)(4) provides a defense to some of the transfers at issue within the ninety-day lookback period and that only $108,844.56 (the "Transfers") remains in dispute and potentially subject to application of an ordinary course defense under § 547(c)(2). As will be discussed below, I conclude that $56,213.70 of the Transfers were inconsistent with the ordinary course of business between Debtor and NOLC and the balance were made in the ordinary course of business.

## I.   JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 547.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F).  Venue is proper pursuant to 28 U.S.C. § 1409(a).

## II.   FACTS NOT SUBJECT TO MATERIAL DISPUTE

On May 29, 2019 (the "Petition Date"), the Debtor filed a voluntary petition pursuant to chapter 7 of the Bankruptcy Code, and the Trustee was appointed.  From March 13, 2019 to May 10, 2019, the ninety-day period before the Petition Date (the "Preference Period"), the Debtor made ten payments totaling $285,388.15 to NOLC.  The Trustee timely commenced the adversary proceeding pursuant to 11 U.S.C. §§ 547 and 550 against NOLC seeking to avoid and recover those payments as preferential transfers.  *Compl.* [Dkt. No. 1] (the "Complaint").

NOLC was founded by H. James LeBoeuf, Jr. in 1995, since which time NOLC engaged in business with Debtor and sold fish products to Debtor.  *Def.'s Resp. to Trustee's Statement of Material Facts and Suppl. of Undisputed Facts* [Dkt. No. 58] ("Def. Material Facts Resp."), ¶¶

3–5.[2] NOLC concedes that the Trustee has established a *prima facie* case under § 547(b) as to the Transfers. NOLC does not dispute that (i) Debtor made each of the Transfers to it and for its benefit during the Preference Period; (ii) it was a creditor of Debtor at the time it received each of the Transfers; (iii) each of the Transfers, at the time such transfer was made, was on account of an antecedent debt owed to it by Debtor; (iv) the Debtor was presumed to be insolvent at the time it made each of the Transfers; (v) NOLC received a greater percentage of what was owed to it than it would have received if the Transfers had not been made and Debtor conducted a liquidation of its business under chapter 7 of Bankruptcy Code; and (vi) NOLC did not hold a security interest in assets of Debtor equal to or exceeding the amount of the Transfers that secured satisfaction of the obligation or debt on account of which the Transfers were made. Def. Material Facts Resp., ¶¶ 9–15.

During the periods relevant to this case, NOLC had a general practice to offer its customers Net 30 payment terms "unless there were extenuating circumstances such as bad credit reporting" or "troubles being listed on credit reports." *Id.* at ¶ 21; H. James [LeBoeuf], Jr. Dep. Tr., January 25, 2022 ("LeBoeuf Dep."), 39. A Net 30 payment term appears to be generally consistent with standard credit terms in the seafood sale industry. Def. Material Facts Resp. ¶ 21; LaBoeuf Dep., at 37; Affidavit of Northern Ocean Marine, Inc. [Dkt. No. 59] ("LeBoeuf Aff."), ¶ 6. NOLC also had a general practice to regularly monitor its customers' credit reports and alter payment terms accordingly. Def. Material Facts Resp., ¶ 22. From January 2016 to January 2018, the payment terms between NOLC and the Debtor were Net 30 Days, Def. Material Facts Resp., ¶ 19; LeBoeuf Dep., at 55, and the Debtor's average time of payment of an invoice was 36.35 days during that two year period, and the range of minimum and maximum

---

[2] While I may cite to specific supporting evidence in the record, my findings are often supported by other evidence in the record, and I do not intend to limit support for my findings to the cited portion of the record.

invoice ages were between 22 days to 50 days.  Def. Material Facts Resp., ¶¶ 19, 23–24;

LeBoeuf Aff., Ex. A; John O. Desmond Aff. ("Desmond Aff."), Ex. K.  As early as 2017, NOLC

learned from credit agencies that Debtor had made late payments to other creditors, and NOLC

learned about similar late payment issues in 2018 and 2019.  Def. Material Facts Resp., ¶ 26;

LeBoeuf Dep., at 43.  At the beginning of 2018, NOLC changed the Debtor's payment terms to

Net 14 Days and then imposed other different payment terms during 2018 (including Net 15

Days, Net 14 Days, Net 7 Days, Net 5 Days, and COD).  Def. Material Facts Resp., ¶ 25;

LeBoeuf Aff., Ex. A; Desmond Aff., Exs. I, J, K.  From November 2, 2018 to February 27, 2019,

with exception of one transaction, NOLC required payment within Net 5 Days.  Def. Material

Facts Resp., ¶ 27; LeBoeuf Aff., Ex. A; Desmond Aff., Ex. K.

　　　　The following table summarizes the record regarding payments made and terms for

invoices dated 12/21/2015 to 02/20/2019:

| Calendar Year | Transactions | Payment Terms | Days to Pay | Days Late |
|---|---|---|---|---|
| 2016 | Total 8 transactions | Net 30 | Average 38.63 | Average 6.88 |
| 2017 | Total 11 transactions | Net 30 | Average 34.81 | Average 4.81 |
| 2018 | Total 21 transactions, expanded below by invoice to payment date | See below | Average 8.1, expanded below | Average 2.1, expanded below |
| | 01/31/2018 to 03/07/2018 | Net 30 | 35 | 5 |
| | 02/21/2018 to 03/15/2018 | Net 14 | 22 | 8 |
| | 03/30/2018 to 04/13/2018 | Net 14 | 14 | 0 |
| | 04/26/2018 to 05/4/2018 | Net 14 | 8 | (6) |
| | 05/14/2018 to 05/29/2018 | Net 7 | 15 | 8 |
| | 07/27/2018 to 07/30/2018 | COD | 3 | 3 |
| | 08/15/2018 to 08/17/2018 | COD | 2 | 2 |
| | 09/13/2018 to 09/13/2018 | COD | 0 | 0 |
| | 09/17/2018 to 09/28/2018 | COD | 11 | 11 |
| | 09/24/2018 to 09/28/2018 | COD | 4 | 4 |
| | 09/26/2018 to 10/05/2018 | Net 15 | 9 | (6) |
| | 10/01/2018 to 10/03/2018 | COD | 2 | 2 |
| | 10/02/2018 to 10/05/2018 | COD | 3 | 3 |
| | 10/02/2018 to 10/05/2018 | COD | 3 | 3 |

| | | | | |
|---|---|---|---|---|
| | 10/12/2018 to 10/16/2018 | COD | 4 | 4 |
| | 11/02/2018 to 11/07/2018 | Net 5 | 5 | 0 |
| | 11/09/2018 to 11/15/2018 | Net 5 | 6 | 1 |
| | 11/14/2018 to 12/06/2018 | Net 5 | 7 | 2 |
| | 11/30/2018 to 12/06/2018 | Net 7 | 6 | (1) |
| | 12/07/2018 to 12/14/2018 | Net 5 | 7 | 2 |
| | 12/17/2018 to 12/21/2018 | Net 5 | 4 | (1) |
| 2019 Pre-Preference Period | Total 22 transactions | Net 5 | Average 9.22 | Average 3.91 |
| **TOTAL** | **Total 62 Transactions** | **N/A** | **Average 17.06** | **Average 3.84** |

Desmond Aff., Ex. K.

During the Preference Period, the Debtor's average time of payment was 13 days, and the range of minimum and maximum invoice ages was between 2 days to 21 days. Def. Material Facts Resp., ¶¶ 28–29; Desmond Aff., Ex. K. The first three invoices during the Preference Period were Net 5 day terms and the remaining thirteen invoices were Net 15 day terms. The average lateness during the preference period was (-1.25) days. Desmond Aff., Ex. K.

In the event of non-payment, LeBoeuf would call Debtor to let it know if Debtor wanted more products it had to pay the invoice. *Trustee's Resp. to Suppl. Of Undisputed Facts* [Dkt. No. 67], ¶ 52; LeBoeuf Aff., ¶ 17. During the Preference Period, NOLC had a number of communications with Debtor. On March 7, March 8, and March 11, 2019, a representative of NOLC, Joyce Martin, emailed the Debtor's Chief Financial Officer, Ana Crespo, requesting the status of three invoices that were past due on terms of Net 5 days. Def. Material Facts Resp., ¶ 35; Desmond Aff., Ex. L. Crespo responded after the third email, indicating that Debtor's cash had been "extremely tight over the past month or so" but that the Debtor's "accounts receivable [were] very high." Def. Material Facts Resp., ¶¶ 36–37; Desmond Aff., Ex. L. On March 13, 2019, per a request from Debtor, Martin forwarded the same email to a representative of Debtor, Jason Brown, and later emailed Brown and another representative of Debtor, Kathy Nolan, to

respond to its questions about open invoices and to confirm an agreed change in payment terms from Net 5 to Net 15 Days.  Def. Material Facts Resp., ¶ 38; Desmond Aff., Ex. L.

On March 27, 2019, Martin informed Nolan and Brown that NOLC would hold two purchase orders until an additional wire transfer was received.  Def. Material Facts Resp., ¶ 39; Desmond Aff., Ex. M.  On April 23, 2019, LeBoeuf reduced Debtor's line of credit with NOLC from $100,000.00 to $50,000.00.  Def. Material Facts Resp., ¶ 41; Desmond Aff., Ex. N. LeBoeuf testified that the reduction was made because he had that "received a call from another company stating the Debtor's invoices were not being paid" and that he "had heard rumors that the Debtor was selling its business."  Def. Material Facts Resp., ¶ 41; LeBoeuf Dep., at 80; Desmond Aff., Ex. N.  LeBoeuf was concerned that "things didn't sound too good," and he did not want more of NOLC's money going out the door.  Def. Material Facts Resp., ¶ 43; LeBoeuf Dep., at 83.  He further stated that he would like to receive payment of the Debtor's oldest invoice by April 29, 2019, which would keep NOLC's exposure under $50,000.  Def. Material Facts Resp., ¶ 41; Desmond Aff., Ex. N.  LeBoeuf that NOLC had "to exercise caution at this time until we hear some better news."  Def. Material Facts Resp., ¶ 41.  Three of the Transfers totaling $56,213.70 were made by Debtor to NOLC after LeBoeuf's April 23, 2019 email correspondence.  Def. Material Facts Resp., ¶ 42; Desmond Aff., ¶ 10.

## III.    POSITIONS OF THE PARTIES

The Trustee moves for summary judgment to avoid and recover the Transfers made by Debtor to NOLC during the Preference Period under §§ 547(b) and 550.  The Trustee contends that NOLC cannot establish under § 547(c)(2) that the Transfers were made in the ordinary course of business or financial affairs of Debtor and NOLC.  The Trustee asserts that the parties did not have a readily ascertainable baseline of dealing because of the frequent changes in

6

payment terms and reduction in credit limit before and during the Preference Period.  Even if a

baseline of dealing could be established, the Trustee submits that the baseline should be the pre-

January 2018 period, before NOLC learned of the Debtor's financial difficulties.  Further,

compared with this baseline period, the Trustee contends that the Transfers were inconsistent

with ordinary course of business between the parties because the payment terms changed from

Net 30 Days during the baseline period to Net 15 Days during the Preference Period and because

the average payment time decreased from 36 days to 13 days.  Finally, the Trustee asserts the

collection activities conducted by NOLC during the Preference Period were unusual, which he

asserts defeats the ordinary course of business defense.

NOLC, in turn, seeks summary judgment in its favor, asserting that the Transfers made

during the Preference Period cannot be avoided and recovered by the Trustee because the

Transfers are exempt under the ordinary business course defense under § 547(c)(2).  NOLC

contends that the appropriate look-back period for the baseline of dealing between the parties

should be two years, the period from 2017 to 2019, immediately preceding the Preference

Period.  NOLC emphasizes that Net 15 Days payment terms used during the Preference Period

were also previously employed during the baseline period, such that the Transfers should be

found consistent with prior baseline of dealing.  Finally, NOLC disputes that any action

committed by NOLC during the Preference Period constituted unusual debt collection efforts.

## IV.  LEGAL STANDARD

### A.  Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment requires the

movant to show that "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also* Fed. R. Bankr. P. 7056

(applying Fed. R. Civ. P. 56 to adversary proceedings); *Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 762 (1st Cir. 1994) ("In bankruptcy, summary judgment is governed in the first instance by Bankruptcy Rule 7056.").  In determining cross-motions for summary judgment, courts "must resolve all genuine factual disputes in favor of the party opposing each such motion and draw all reasonable inferences derived from the facts in that party's favor" by evaluating "each motion separately, drawing inferences against each movant in turn." *Atlantic Fish Spotters Ass'n v. Evans*, 321 F.3d 220, 224 (1st Cir. 2003); *E.E.O.C. v. Steamship Clerks Union, Loc. 1066*, 48 F.3d 594, 603 n.8 (1st Cir. 1995).

The movant "bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the movant satisfies the initial responsibility, the burden of proof shifts to the nonmoving party, who must designate "specific facts showing . . . genuine issue for trial." *See id.* at 324. The nonmoving party must do more than show "metaphysical doubt as to the material facts" and may not rest upon the allegations or denials of his or her pleading. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

A dispute is "genuine" where the evidence is "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995).  A fact is "material" if its existence or nonexistence "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

**B.  Ordinary Course of Business Defense**

Section 547(b) allows the trustee to avoid and recover any transfer of an interest of the

debtor in property as long as all sections from (b)(1) to (b)(5) are satisfied.  11 U.S.C § 547(b).

Even if a transfer satisfies all the elements of § 547(b), it nevertheless may not be avoided if the

opposing party shows that the transfer satisfies one of the exceptions listed in § 547(c).  Section

547(c)(2) permits a "safe harbor" for preferential transfer payments if "such transfer was in

payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of

the debtor and the transferee, and such transfer was (A) made in the ordinary course of

business . . . of the debtor and transferee; or (B) made according to ordinary business terms."  11

U.S.C § 547(c)(2).  In this case, the only issue to be decided is whether NOLC can meet its

burden of showing that some or all of the Transfers meet the requirements to satisfy the ordinary

course of business defense.  11 U.S.C § 547(g) (providing that "[f]or the purposes of this section,

the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this

section, and the creditor or party in interest against whom recovery or avoidance is sought has

the burden of proving the nonavoidability of a transfer under subsection (c) of this section").

The parties do not dispute that debt was incurred in the ordinary course of each party's business.

Accordingly, I must determine whether any or all of the Transfers during the Preference Period

were either 1) made in the ordinary course of business of these parties or 2) made "according to

ordinary business terms."

    *1.   Ordinary Course of Business of the Debtor and Transferee — the "Subjective Test"*

"The determination of whether a creditor has met its burden under § 547(c)(2)(A) is a

subjective test, 'calling for the Court to consider whether the transfer was ordinary as between

the debtor and the creditor.'"  *Stanziale v. S. Steel and Supply, L.L.C. (In re Conex Holdings,*

*LLC)*, 518 B.R. 269, 280 (Bankr. D. Del. 2014) (quoting *In re First Jersey Sec., Inc.*, 180 F.3d

504, 512 (3d Cir. 1999)).  Courts consider a number of factors in this test, including: "(1) the

length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers

were in an amount more than usually paid; (3) whether the payments at issue were tendered in a

manner different from previous payments; (4) whether there appears to have been an unusual

action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did

anything to gain an advantage (such as additional security) in light of the debtor's deteriorating

financial condition."  *Id.*  No one factor is dispositive.  To evaluate whether transfers were in the

ordinary course of business, the Court must first determine what the ordinary course of business

was before the Preference Period and then compare the preferential transfers to it.  *See, e.g.,*

*DeGiacomo v. Raymond C. Green, Inc. (In re Inofin Inc.)*, 512 B.R. 19, 102 (Bankr. D. Mass.

2014) ("a defendant must establish a baseline of dealings between the parties to enable the court

to compare the payment practices during the preference period with the prior course of dealing")

(internal quotations and citation omitted)).

 "The ordinary course defense was designed to 'leave undisturbed normal commercial and

financial relationships and protect recurring, customary credit transactions which are incurred

and paid in the ordinary course of business of both the debtor and the debtor's transferee.'"

*Comm. Unsecured Creditors of Gregg Appliances v. Curtis Int'l Ltd. (In re hhgregg, Inc.)*, 636

B.R. 545, 549 (Bankr. S.D. Ind. 2022) (quoting *Kleven v. Household Bank, F.S.B.*, 334 F.3d 638,

642 (7th Cir. 2003)).  Section 547(c) exceptions are "designed to rescue from attack in

bankruptcy those kinds of transactions . . . that are essential to commercial reality and do not

offend the purposes of preference law, or that benefit the ongoing business by helping to keep

the potential bankrupt afloat."  *See Wiscovitch-Rentas v. Villa Blanca VB Plaza LLC (In re PMC*

*Mktg. Corp.) ("In re PMC")*, 543 B.R. 345, 356 (B.A.P. 1st Cir. 2016) (internal quotations

omitted).  Particularly, the legislative history of § 547(c)(2) reveals that its purpose was "to leave undisturbed normal financial relations." *Brandt, Jr. v. Repco Printers & Lithographics, Inc. (In re Healthco Intern., Inc.)*, 132 F.3d 104, 109 (1st Cir. 1997) (quoting H.R. Rep. No. 95-595, at 373 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6329); *see also Cent. Hardware Co., Inc. v. Sherwin-Williams Co. (In re Spirit Holding Co.)*, 153 F.3d 902, 904 (8th Cir. 1998) (same). "[N]o precise legal test" exists for § 547(c)(2)(A) to determine whether a preferential transfer was made in the ordinary course of business between the debtor and the creditor.  *See In re PMC*, 543 B.R. at 357 (quoting *Cox v. Momar Inc. (In re Affiliated Foods Sw. Inc.)*, 750 F.3d 714, 717 (8th Cir. 2014)).  By contrast, the Court must engage in a "peculiarly factual analysis."  *See id.* The hallmark of a payment in the ordinary course of business is "consistency with prior practice." *In re Healthco Intern, Inc.*, 132 F.3d at 110.[3]

   2.  *Ordinary Business Terms — the "Objective Test"*

   NOLC does not argue that any evidence supports application of § 547(c)(2)(B) to its ordinary course of business defense. *See Mem. of Law in Opp. of Trustee's Mot. for Summ. J. and in Supp. of Def.'s Cross-Mot. for Summ. J.* ("Def. Supp. for Cross-Mot.") [Dkt. No. 60]. "Subsection (B) is an objective test which looks not to the specifics of the transaction between the debtor and particular creditor, but rather focuses on general practices in the industry, in particular the industry of the creditor." *See Pereira v. United Parcel Serv. of Am. (In re Waterford Wedgwood USA, Inc.)*, 508 B.R. 821, 828 (Bankr. S.D.N.Y. 2014) (internal quotations omitted).  "Under this standard, a creditor must show that the business terms of the transaction in

---

[3] Because the subjective ordinary course of business defense is so dependent on factual findings, some courts have gone so far as to hold that "the general rule is that the ordinary course of business defense cannot be determined on a motion for summary judgment." *Goldberg v. Graybar Elec. Co. (In re ACP Ameri–Tech Acquisition, LLC)*, No. 09-90082, 2012 WL 481582, at *7 (Bankr. E.D. Tex. Feb. 14, 2012) (quoting *Ice Cream Liquidation, Inc. v. Niagara Mohawk Power Corp. (In re Ice Cream Liquidation, Inc.)*, 320 B.R. 242, 250 (Bankr. D. Conn. 2005)).

question were 'within the outer limits of normal practice . . . .'" *Id.* (quoting *Lawson v. Ford*

*Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 40 (2d Cir. 1996)).  NOLC does not cite to

evidence in the record that would establish the general payment-terms practice in the industry,

although NOLC appears to acknowledge that generally 30-day terms are the practice in the

industry subject to adjustment.  Def. Material Facts Resp., ¶ 21; LeBoeuf Dep., 37; LeBoeuf

Aff., ¶ 6.  NOLC does not argue that evidence in the record satisfies the objective test of §

547(c)(2)(B).  As such, I will only address the "subjective" test of § 547(c)(2)(A).

## V.   ANALYSIS OF THE ASSERTED § 547(c)(2)(A) SUBJECTIVE ORDINARY COURSE OF BUSINESS DEFENSE

### A. Historical Baseline of Dealing

The ordinary course analysis requires the creditor asserting a § 547(c)(2)(A) defense to

establish a "baseline of dealing" between the debtor and the creditor over a historical period

against which to compare payments made within the preference period.  Often, courts have held

that the baseline period "should be 'well before' the preference period."  *See In re PMC*, 543

B.R. at 358; *see also In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032 (7th Cir. 1993); *In re*

*Inofin Inc.*, 512 B.R. at 102.  These courts have reasoned that the historical baseline "should be

based on a time frame when the debtor was financially healthy."  *See In re PMC*, 543 B.R. at

358; *see also Unsecured Creditors Comm. of Sparrer Sausage Co., Inc. v. Jason's Foods, Inc.*

*("Jason's Foods")*, 826 F.3d 388, 394 (7th Cir. 2016) (finding "the baseline should reflect

payment practices that the companies established before the onset of any financial distress

associated with the debtor's impending bankruptcy"); *In re Affiliated Foods Sw. Inc.*, 750 F.3d at

720 (using "time frame when the debtor was financially healthy" in order to "make a sound

comparison"); *Quebecor World Litig. Tr. v. R.A. Brooks Trucking, Co. (In re Quebecor World*

*(USA), Inc.)*, 491 B.R. 379, 387 (Bankr. S.D.N.Y. 2013) (choosing the baseline as two years over

one year because the longer period "more accurately reflect[ed] the parties' ordinary course of dealing during the period when the Debtor was in better financial health."). The determination of the historical baseline of dealing should be "grounded in the companies' payment history rather than dictated by a fixed or arbitrary cutoff date." *See Jason's Foods*, 826 F.3d at 394.[4]

Here, the Trustee argues that the frequent changes in payment terms before and during the Preference Period prevented NOLC from establishing a consistent baseline period. As the creditor seeking the exception, NOLC bears the burden to establish a relevant baseline period that includes when the Debtor was not in financial distress. The earliest transaction with a written invoice between Debtor and NOLC in the record is dated December 10, 2015, which was paid in January 2016, and the record contains evidence that NOLC believed that Debtor was making late payments to vendors as early as 2017, by certainly after January 2018. Desmond Aff., Exs. I, J, and K; LeBoeuf Dep., 43–44. Prior to the end of January 2018, the payment terms between the parties were Net 30 days. Desmond Aff., Ex. K. During the rest of 2018, the payment terms stated on invoices ranged from COD to Net 15 days. *Id.*; LeBoeuf Aff., Ex. A. In 2019, prior to the Preference Period, stated terms were Net 5 days. *See, e.g.,* Desmond Aff., Ex. K. During the Preference Period, payment terms were Net 5 days for the first 3 invoices, but increased to Net 15 days for the last 13 invoices. *See id.*

Some courts have held that changes in payment terms prior to or during the preference period precludes application of the ordinary course of business defense. *See, e.g., Hechinger Inv. Co. of Del., Inc. v. Universal Forest Prods. (In re Hechinger Inv. Co. of Del., Inc.)*, 489 F.3d

---

[4] Notwithstanding the common emphasis of establishing a historical period that reflects an ordinary course of business, some courts have held that the subjective ordinary course of business defense is available to preference defendants even where a preferential payment was made on account of the first transaction between the parties. *See, e.g., Jubber v. SMC Elec. Prods. (In re C.W. Mining Co.)*, 798 F.3d 983, 989 (10th Cir. 2015) ("[W]e agree with the three circuits that have addressed the issue, who have held that a first-time transaction can qualify for the exception.").

568, 577 (3d Cir. 2007) (affirming the bankruptcy court's finding that making new credit terms immediately prior to the preference period was so "out of character with the long historical relationship between [the] parties" that the payments were outside of the ordinary course of dealings between the parties); *J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 891 F.2d 66, 70–72 (3d Cir. 1989) (affirming the district court's finding that changing the payment terms as a result of the debtor's deteriorating financial condition precluded an ordinary course of business defense); *Roberds, Inc. v. Broyhill Furniture (In re Roberds, Inc.)*, 315 B.R. 443, 465 (Bankr. S.D. Ohio 2004) (change in terms during the preference period was a factor supporting the denial of the ordinary course of business defense).  Other courts have determined that through workout arrangements parties can establish a new "ordinary" course of business prior to the preference period if resulting from the debtor's efforts to prefer the transferee over other creditors or out of the ordinary pressure by the transferee.  *See, e.g., In re NorthPoint Commc'ns Grp., Inc.*, 361 B.R. 149, 157 (Bankr. N.D. Cal. 2007), *aff'd*, 2007 WL 7541001 (B.A.P. 9th Cir. Nov. 7, 2007) (("a payment pursuant to a pre-bankruptcy workout, for which there was no precedent between the parties, was nonetheless within the ordinary course of business between the parties" because the facts and circumstances indicated that the transfer did not result from "pressure by the transferee or from the debtor's desire to prefer the transferee over other creditors"  (citing *Abovenet, Inc. v. Lucent Techs., Inc. (In re Metromedia Fiber Network, Inc.)*, No. 02 B 22736, 2005 WL 3789133, *7 (Bankr. S.D.N.Y. 2005))).  Sales of seafood products in the industry are generally negotiated on a transaction-by-transaction basis.  LeBoeuf Aff., ¶¶ 5–9.  NOLC did not have "set" or long-term contracts with any customers, including the Debtor.  *Id.* at ¶ 10.  Each separate purchase order and invoice of the Debtor was "subject to separate negotiations" based on credit reports, information from other vendors, quantity of fish being purchased, credit terms

with NOLC's suppliers, NOLC's adherence to its payment terms, and discussions with the

Debtor.  *Id.* at ¶¶ 9–16.

The Trustee asserts that because of this fluctuation in terms, NOLC may not assert an

ordinary course defense because there can be no reliable baseline established.  In the alternative,

it appears that if any baseline is capable of being established, the Trustee contends that the Court

should establish a baseline period prior to the time when evidence suggests that NOLC was

aware that the Debtor was experiencing difficulty paying other vendors and reduced its credit

terms from Net 30 to Net 15.  The Trustee, therefore, asserts that the relevant period should be

from January 2016 to January 2018, beginning three years prior to and ending a year before the

Prepference Period.  During that period,

> the average days between NOLC's invoice and the Debtor's payment was thirty-
> six (36) days. [Def. Material Facts Resp., ¶ 23.] Further, on average, the Debtor's
> payments were made six (6) days late. [*Id.*at ¶ 24.]  In comparison, during the
> Preference Period, the payment terms were initially Net 5 Days, and were
> ultimately changed to Net 15 Days.  [*Id.* at ¶ 28.]  During the entire Preference
> Period, the average time between NOLC's invoice and the Debtor's payment was
> thirteen (13) days, i.e., a reduction of twenty-three (23) days, from the period
> from January 2016 to January 2018.  [*Id.* at ¶ 29.]  Moreover, the payments during
> the entire Preference Period were, on average, made on time, while after the term
> changed to Net 15 Days, the Debtor tendered payment to NOLC three (3) days
> earlier than the terms of NOLC's invoices on average.  [*Id.* at ¶¶ 30, 31.]

*Mem. of Law in Supp. of Chapter 7 Trustee's Mot. for Summ. J.* [Dkt. No. 52], at 13–14.

NOLC asserts that the baseline period should be the two years immediately preceding the

Preference Period.  Def. Supp. for Cross-Mot. at 9.  It asserts that the fact that payment terms

varied in the year prior to the Preference Period "does not preclude establishing a consistent

baseline." *Id.* at 10.  NOLC argues that the Net 15 day terms reflected on all but 3 invoices

during the Preference Period are not materially inconsistent with the range of terms in the

preceding year where the terms ranged from COD to Net 15 days.  Moreover, NOLC asserts that

its actions in relation to supplying seafood to the Debtor are consistent with the goals of the

ordinary course defense in that it increased the payment terms from Net 5 to Net 15 during the

Preference Period because it was working with the Debtor to supply the Debtor with needed

goods.

The Court has discretion to determine which test or methodology to apply when

analyzing payments made during the preference period based on the facts and circumstances of

the historical relationship between the parties.  *See Jason's Foods*, 826 F.3d at 395.  The

Bankruptcy Appellate Panel for the First Circuit (the "BAP") has observed that "[t]here is 'no

precise legal test' to determine whether a preferential transfer was made in the ordinary course

of business between the debtor and the creditor[.]"  *In re PMC*, 543 B.R. at 357  (internal

quotations and citation omitted).  In *In re PMC*, the BAP surveyed the goals of a baseline

analysis and the different methodologies employed by courts in considering whether payments

made by debtors were outside the ordinary course of business between the parties.  *Id.* at 357–

62.  One aspect of the holding in *In re PMC* is instructive.  In that case, the BAP reversed

summary judgment in favor of a defendant asserting an ordinary course of business defense

based on the bankruptcy court's determination that the defendant had satisfied its burden

because the evidence showed that payment dates were inconsistent and the payment relationship

between the parties "seemed to be a rather flexible one" without engaging in "a more elaborate,

multi-factor analysis to assess whether a challenged transaction is consistent with the parties'

course of dealing."  *Id.* at 361.  In this case, NOLC argues that the fact that payment terms

varied from 0 to 30 days in the year preceding the Preference Period should not mean that a

baseline cannot be established and an ordinary course defense should fail as a matter of law.  I

agree and note that:

> The First Circuit instructs that the factors that "bear upon whether a particular
> transfer warrants protection under [§] 547(c)(2) . . . include the amount

transferred, the timing of the payment, the historic course of dealings between the debtor and the transferee, and the circumstances under which the transfer was effected." *In re Healthco*, 132 F.3d at 109 (citations omitted)

*In re PMC*, 543 B.R. at 358.  These factors weigh against summarily concluding that no historic baseline could be reliable.

Based on the facts and circumstances of this case, I will analyze the relationship of the Debtor and NOLC using as a baseline both the two-year period preceding the Preference Period and the period suggested by the Trustee that ends on January 3, 2018 when historic payment terms changed.  *See In re Quebecor World (USA), Inc.,* 491 B.R. at 387 (adopting a two-year look back period instead of one-year, because the longer period "more accurately reflect[ed] the parties' ordinary course of dealings during the period when the Debtor was in better financial health"); *see also Lovett v. St. Johnsbury Trucking,* 931 F.2d, 494 498 (8th Cir. 1991) (holding that the appropriate look-back period was twelve months, because "[i]t reflected the normal operations under the [parties'] agreement"); *In re Waterford Wedgwood USA, Inc.*, 508 B.R. 821, 833 (Bankr. S.D.N.Y. 2014) (applying a flexible approach in a subjective and objective ordinary course defense case and observing to do otherwise "would [] require a creditor to steadfastly adhere to the same business practices throughout the entirety of its relationship with a debtor" and "unduly tie the hands of the creditor to deal with the exigencies of business in a real world setting and discourage creditors from continuing to do business with a company in distress"); *cf. In re hhgregg, Inc.*, 636 B.R. at 550 n.3 (where the court used a two year period in considering a motion for summary judgment and rejecting argument that the historic baseline period should exclude the ten-month period immediately prior to the preference period because the debtors were not financially healthy during that period); *Jason's Foods*, 826 F.3d at 394 (not error for bankruptcy court to use historic pre-preference period preceding date that "mark[ed] the beginning of the debtor's financial difficulties"); *Siegel v. Russellville Steel Co. (In re Cir. City*

*Stores, Inc.)*, 479 B.R. 703, 710 (Bankr. E.D. Va. 2012) (using a historic period preceding a

"liquidity event" for comparison where the debtor's practices significantly changed after that

event).  I have considered evidence in the record regarding the course of dealings of NOLC and

the Debtor, the length of the commercial relationship, the substantial length of the period

following the time when evidence would support a finding that NOLC considered that the Debtor

might be in some financial distress, the objectives of the Bankruptcy Code, and the positions of

the parties in evaluating each of these historical baselines to determine what most fairly reflects

the ordinary course of dealings of the parties.

### B.  Transfers Should Be Consistent with Ordinary Course of Business

The United States Court of Appeals for the First Circuit (the "First Circuit") has

established multiple factors to help determine whether a challenged transfer falls under the

ordinary course of business between the debtor and the creditor to "warrant[] protection under §

547(c)(2)," which includes "the amount transferred, the timing of the payment, the historic

course of dealings between the debtor and the transferee, and the circumstances under which the

transfer was effected."  *In re Healthco Intern., Inc.*, 132 F.3d at 109; *see also In re Inofin Inc.*,

512 B.R. at 102.  Even if the challenged transfers are irregular, courts may still consider them as

"ordinary" for purposes of § 547(c)(2), if they are consistent with the prior course of dealing

between the debtor and the creditor.  *See, e.g.*, *Yurika Foods Corp. v. United Parcel Serv. (In re

Yurika Foods Corp.)*, 888 F.2d 42, 44 (6th Cir. 1989).  However, the First Circuit has refused to

apply § 547(c)(2) exception where there were "virtually no significant similarities between the

challenged payment and the antecedent course of dealings between the parties."  *In re Healthco

Intern., Inc.*, 132 F.3d at 109–10 (holding the challenged transfer was extraordinary when the

transfer marked the first time that the debtor paid all its outstanding invoices to the creditor, the

first time that the debtor wired funds to the creditor, and the first time that the debtor's chief financial officer interceded to effectuate a payment to the creditor, along with the facts that the amount of payment was nearly ten times larger than the average of the debtor's previous payment and the timing of payment was highly suspicious).  Other circuits have echoed the First Circuit's position by ruling that the challenged transfers are inconsistent with the ordinary course when significant transaction terms are "so extreme, and so out of character with the long historical relationship between these parties."  *See e.g.*, *In re Hechinger Inv. Co. of Del.*, 489 F.3d at 577–78; *J.P. Fyfe, Inc.*, 891 F.2d at 67–71.  In many cases, payments made by debtors deviate from the historic ordinary course of business because the payments are made a greater amount of time after invoice, but "[j]ust as payments that are made after the due date may be considered out of the ordinary course, payments may likewise be out of the ordinary course of business if they are made before the due date, and the transferee does not produce evidence that early payment was the norm between the parties prior to the preference period."  5 *Collier on Bankruptcy* ¶ 547.04[2][a][ii] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2023).

Bankruptcy courts usually compare to the baseline payment practice in one of two ways: "the average-lateness method" where the average invoice age during the baseline period is used to determine whether the transfers during the preference period are ordinary and "the total-range method" where the minimum and maximum invoice ages during the baseline period are used to establish an acceptable and ordinary range of payments.  *See, e.g.*, *Jason's Foods*, 826 F.3d at 395 (finding the average-lateness method "better compensates for outlier payments during the historical period" and the total-range method "provides a more complete picture of the relationship between the creditor and debtor").

While some deviation from the historical average during the baseline period is permitted, a huge disparity or significant difference cannot be considered ordinary. *See In re Quebecor World (USA), Inc.*, 491 B.R. at 387–88 (holding the challenged payments were not ordinary because of a significant difference between two periods, when the court found the average payment time increased from 27.56 days during the baseline period to 57.16 days during the preference period and the percentage of the amount paid between 11 and 40 days after receipt of invoice reduced from 88 percent to 22 percent); *see also In re Affiliated Foods Sw. Inc.*, 750 F.3d at 720–21 (affirming the district court's holding that the challenged payment was ordinary, when the court found that the payments during the baseline period were made between 13 to 49 days after invoice date with an average payment time as 35 days and the challenged payment during the preference period was made 26 days after invoice date); *Burtch v. Detroit Forming, Inc. (In re Archway Cookies)*, 435 B.R. 234, 243–44 (Bankr. D. Del. 2010), *aff'd*, 511 B.R. 726 (D. Del. 2013) (finding that the challenged payments were made in the ordinary course, especially because during the baseline period, all 107 payment were made between 21 and 177 days after the invoices were issued with an average payment time as 42.3 days, and during the preference period, all 10 payments were made between 41 and 64 days with an average as 47.2 days).

In *Branch v. Hill, Holliday, Connors, Cosmopoulos, Inc. Advert. (In re Bank of New England Corp.)*, the court held that the challenged payments were made in the ordinary course of dealing between the parties, as the court determined that during the baseline period, the average time of payment was 40 days with a range of 3 to 366 days after the invoices were issued, and during the preference period, the average time of payment was 43.46 days with a range of 22 to 79 days. *See* 165 B.R. 972, 979 (Bankr. D. Mass. 1994). The court highlighted that the

difference between 40 days and 43.46 days was not significant to exclude the protection under §
547(c)(2).  *See id*.

Here, using the average-lateness method applied to NOLC's suggested baseline period,
the average payment time from the date of invoice to payment reduced from 13.29 days during
that baseline period to 13 days during the Preference Period.  Desmond Aff., Exs. J, K.  There
were 53 invoices and payments in the baseline period, of which, for consideration using the total
range method, the greatest difference from invoice date to payment was 43 days and the least
was 0 days.  *Id.*  The range during the Preference Period was between 2 days to 21 days.  *Id.*
Given that payment terms changed during the baseline period and the Preference Period, I have
also examined the average of days of payment after stated terms during those periods.  During
the baseline period, the average days that payments were "late" after stated terms was 3.16.  *Id.*
During the entire Preference Period, the average was (-1.25) days and, after the change in terms
to Net 15 days, the average was (-3.31) days.  *Id.*  Using a historic baseline that begins on
December 21, 2015 and ends on January 31, 2018, as suggested by the Trustee, there were 20
invoices at Net 30.  Most instructive to me was that the average days "late" after stated terms
was 5.65 days in this period.  Of course, the "days to pay" was substantially larger because terms
were Net 30 days, but I do not believe that accurately reflects the course of dealings between the
parties that changed more than a year before the Preference Period.  As another data point, taking
the entire period of available data before the Preference Period, the average days that payments
were "late" after stated terms was 3.84 days.  *Id.*

I give greatest weight to comparing the average days "late" after stated payment terms of
the Preference Period to each of the other baseline periods that I have analyzed.  I cannot say that
there are "virtually no significant similarities" between payments during the Preference Period

and those during the various baseline periods.  *See In re Healthco Intern., Inc.*, 132 F.3d at 109–

10; *see also In re Bank of New England Corp.,* 165 B.R. at 979 (transfers held to be in the

ordinary course of business where difference of 3.46 days existed).  "In cases examining long-

standing relationships between debtors and suppliers, it is apparent that averages which are

within these ranges are acceptable."  *Ryniker v. P. Kaufmann, Inc. (In re Décor Holdings Inc*.),

No. 19-71020, 2022 WL 348625, at *3 (Bankr. E.D.N.Y. Feb. 3, 2022) (citing *Jason's Foods*,

826 F.3d at 396) (five-day change from 22 average days to pay in historic period to 27-day

average in preference period was not "substantial enough to take any of the preference-period

payments outside the ordinary course"); *Lovett*, 931 F.2d at 498 (payments were made in

ordinary course of business where they were paid 52 days on average compared to historical

average of 62); *Pirinate Consulting Group, LLC v. Kadant Solutions Div. (In re NewPage

Corp.*), No. 11-12804, 2016 WL 5787237, at *4–5 (Bankr. D. Del. Sept. 30, 2016), *aff'd*, 569

B.R. 593 (D. Del. 2017) (three-day change from 57 average days to pay in historic period to 54-

day average in preference period found within ordinary course of business).

I have flexibility in  applying the factors set out by the First Circuit and do not have to

rigidly apply any baseline payment practice test discussed above.  *See In re Healthco Intern.,

Inc.*, 132 F.3d at 109.  Rather, I consider the analysis above in applying those factors and in

determining that the Transfers were not inconsistent with the prior course of dealing between the

parties from 2015 to the Preference Period, including giving some consideration to 2018.  This

leaves me to consider whether any other circumstances or unusual collection practices might

place the Transfers outside the ordinary course of business between the parties.

**C. Unusual Debt Collection Practices During the Preference Period or Other Circumstances**

During the preference period, a debtor's payment as a result of a creditor's unusual debt collection actions may defeat the ordinary course of business defense under § 547(c)(2). *See e.g.*, *Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1566 (8th Cir. 1986); *FBI Wind Down, Inc. v. Careers USA, Inc. (In re FBI Wind Down, Inc.)*, 614 B.R. at 491–92 (Bankr. D. Del. 2020). In addition, courts usually "conduct a comparative analysis" to consider debt collection practices in both pre-preference and preference periods to determine whether these actions during preference period are so unusual that they fall outside the ordinary course of business between the parties. *See Rifken v. Entec Distrib., LLC. (In re Felt Mfg. Co.)*, No. 05-13724, 2009 WL 3348300, at *8 (Bankr. D.N.H. Oct. 16, 2009). This analysis should be "case by case, focusing on the particular circumstances." *See id.*

Unusual collection activity consists of "unusual behavior designed to improve the lot of one creditor at the expense of the others at a time when bankruptcy looms on the horizon of an infirm debtor-to-be . . . ." *Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 225 (3d Cir. 1994). Courts have considered "whether the creditor exercised leverage and increased its own security and safety." *In re Felt Mfg. Co.*, 2009 WL 3348300, at *9; *see, e.g.*, *XTRA Inc. v. Seawinds Ltd. (In re Seawinds Ltd.)*, 91 B.R. 88, 92 (N.D. Cal. 1988), *aff'd*, 888 F.2d 640 (9th Cir. 1989) (finding that creditor committed unusual collection practices through economic pressure to obtain payment by terminating contracts, requiring immediate payment, and demanding return of equipment). The fact that the creditor knew of the debtor's financial troubles is also essential in determining the existence of unusual debt collection practices. *Compare In re Felt Mfg. Co.*, 2009 WL 3348300, at *9 (finding the

new consignment agreement implemented when the creditor knew the debtor was in financial

difficulty constituted unusual debt collection practices because the agreement increased the

creditor's economic leverage by making sure the debtor would not exceed its credit limit), *with*

*Harrison III v. Ink Spot (In re Rave Commc'ns, Inc.)*, 128 B.R. 369, 373 (Bankr. S.D.N.Y. 1991)

(holding that it was not unusual for the creditor to employ the debt collection practices, such as

collecting an unusually high payment, especially because the creditor didn't know the debtor's

financial difficulties well until the payment checks bounced later).

Here, the Trustee asserts that NOLC engaged in unusual collection activities during the

Preference Period. NOLC disputes that these activities constituted collection activity or were

unusual, but it seems clear that NOLC had concerns about the Debtor's financial stability or cash

flow during that period.  To undertake "a comparative analysis," I have examined relevant acts in

the record during both baseline period and Preference Periods.  *See In re Felt Mfg. Co.*, 2009 WL

3348300, at *8.  LeBoeuf testified that it was his practice to call the Debtor and other customers

to pay invoices that were due before being able to buy more products and that on an infrequent

basis would inform the Debtor that NOLC would hold a purchase order until outstanding

amounts owed by the Debtor were paid.  LeBoeuf Dep. at 47–49; LeBoeuf Aff., ¶ 17.  The

record reflects that this was not the only way NOLC communicated with the Debtor regarding

balances during the Preference Period.  Another employee of NOLC, Martin, emailed the Debtor

about the status of three past due invoices on March 7, March 8, and March 11, 2019.  Ex. L.

The first email contained a request that the Debtor inform NOLC of the payment status of three

invoices that were past due.  *Id.*  After not receiving a response, Martin resent the email twice.

*Id.*  The Chief Financial Officer of Debtor, Crespo, responded that she did not realize that the

terms were Net 5 days and that Debtor's cash had been "extremely tight over the past month or

so" because of strong sales orders from its customers for the Lenten season. *Id.* On March 13

and 14, 2019, there was a further exchange involving Brown where Martin provided a report of

past due invoices and updated accounts receivable information at the request of Brown. *Id.* In a

March 13, 2019 email, Martin informed the Debtor that it received a purchase order in the

amount of $57,865.50 and that the "agreed upon terms" would be 15 days. *Id.*

I infer from these exchanges and the activity of NOLC that NOLC was closely managing

its exposure during this period but was working to supply the Debtor and actually provided

increased payment terms.  From the summary judgment record, these activities appear to be

generally consistent with NOLC's practices and, while a very close call, did not appear to be

unusual behavior  intended so NOLC would gain an advantage at the expense of a Debtor in

financial difficulties.

Further, the changes in payment terms and timing of payment and the collection

activities, in aggregate, did not render the Transfers "so out of character with the long historical

relationship between these parties," to impose additional pressures on Debtor to make

accelerated payments on the horizon of Debtor's impending bankruptcy.  *See e.g.*, *In re

Hechinger Inv. Co. of Del.*, 489 F.3d at 577–78 (finding the new credit arrangements during the

preference period pressured the debtor to "make accelerated payments during the preference

period" because the creditor tightened its credit terms from Net 30 Days to Net 8 Days, changed

an open line of credit to a $1 million credit limit, required the debtor to make payments by wire

transfer in large amounts, and asked the debtor to send remittance advices after making

payments); *J.P. Fyfe, Inc.*, 891 F.2d at 67–71 (affirming the district court's finding that the

challenged transfers were not made within the ordinary course of business when the new

arrangement "was clearly intended to control the [debtor's] account to a greater extent than [the

creditor] had ever been controlled."). NOLC's increase in credit terms during the Preference

Period weighs against a finding that NOLC was attempting to accelerate payments and improve

its position. In this case, had NOLC not carefully held the Debtor to payment terms, it may have

had greater exposure to a preference claim. As discussed above, the collection/account

management activities did not result in any material change in the average days for collection of

invoices in the period preceding that period. Certainly, withholding shipments and dunning calls

or letters may constitute unusual collection activities, but the actions of NOLC in the context of

this case do not.

On April 23, 2019, during the Preference Period, NOLC also reduced the Debtor's

credit limit from $100,000 to $50,000. Def. Material Facts Resp. ¶ 41. I have considered this

in the context of the parties' relationship and the acts taken by NOLC. While there is

testimony that the credit limit imposed by NOLC on the Debtor depended on the dollar value of

the sale and was set "sale to sale," LeBoeuf Dep. 44–45, 79, the record does not contain any

documentary evidence showing fluctuations in the credit limit between the parties. In an email

from LeBoeuf, on April 23, 2019, he notified the Debtor that the credit limit would be reduced.

Ex. N. Even though Debtor only made one order after that email, LeBoeuf Aff., Ex. A; Ex. K,

I infer from evidence in the record that the intent or effect of that reduction was to reduce a

balance owed to NOLC and to accelerate payments. LeBeouf testified that the reduction was

made because he had "received a call from another company stating that the Debtor's invoices

were not being paid" and that he "had heard rumors that the Debtor was selling its business."

Def. Material Facts Resp., ¶ 41; Desmond. Aff., Ex. N. He stated that he would like to receive

payment of the Debtor's oldest invoice by April 29, 2019, which would keep NOLC's exposure

under $50,000. Def. Material Facts Resp., ¶ 41. His action was in direct response to bad credit

reports from other companies and a rumor of a sale. *Id.* I find that that demand went beyond holding purchase orders and was not balanced by "increasing" payment terms to Net 15 days during the Preference Period, because NOLC's exposure would be reduced to $50,000, and the Debtor would not likely be able to maintain its purchasing level to take advantage of the increased terms. Three of the Transfers totaling $56,213.70 were made by Debtor to NOLC after LeBeouf's April 23, 2019 email correspondence. These three transfers were made outside of the ordinary course of dealings between the Debtor and NOLC.

## VI.    CONCLUSION

For the reasons discussed above, I will grant NOLC's cross-motion for summary judgment in part and grant the Trustee's motion for summary judgment in part. A judgment in favor of the Trustee in the amount of $56,213.70 consistent with this decision will enter.

Dated: April 1, 2024                    By the Court,

                                        _____
                                        Christopher J. Panos
                                        United States Bankruptcy Judge